UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| CHARLES MEAD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:06-CV-80 |
| ) | (Phillips) |
| JASON JOSEPH, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff Charles Mead has sued defendant Jason Joseph[1] alleging violations of his Fourth, Fifth and Fourteenth Amendment rights. Specifically, plaintiff alleges that defendant violated his right to freedom from unreasonable search and seizure, and right to freedom from excessive force during a traffic stop and investigation. This matter is before the court on defendant Joseph's motion for summary judgment. For the reasons which follow, defendant's motion will be granted and this matter dismissed against Jason Joseph.

The parties have filed extensive briefs pertaining to the motions for summary judgment in which they have fully briefed all of the issues and submitted record evidence in support of the parties' positions. The court has reviewed the briefs and evidence

---

[1] Defendants James Washam, Thomas Guinn, John Doe 2, and the City of Kingston were dismissed by agreement of the parties [Doc. 18].

submitted, and does not feel that oral argument is necessary.  Therefore, plaintiff's motion for oral argument [Doc. 27] is **DENIED.**

## Summary of the Facts

The facts, except where indicated, are undisputed.  Mead alleges in his complaint that on November 12, 2005, he was traveling west on I-40, west of the Kingston exit, when he was pulled over by Officer Joseph and other defendants.  Mead alleges that he was pulled over at approximately 6:45 p.m. and it was dark at the time.  When Mead stopped his vehicle, he was instructed by Officer Joseph to put both his arms out the window and he did so.  Mead claims he was then "grabbed by the collar, dragged out of the vehicle, and told to lay on the ground."  Mead alleges that he told Officer Joseph that he was "crippled" and was "unable to get on the ground," and that Officer Joseph then "threw him across the back of his truck bed, grabbed his hands, and forcefully placed his wrists in handcuffs.  Mead claims that Officer Joseph attached the handcuffs so tightly that it caused Mead's wrists to bleed.  Mead claims that he was then frisked and his wallet was removed from his left front pocket.

Mead alleges that shortly after his wallet was removed from his pocket, "another officer from the Kingston Police Department showed up, and commented, 'Are you not the fellow that works with wood?'"  When Mead responded that he was, indeed, the "fellow that works with wood," the officers "began to ease up on him, and very shortly thereafter, released him by unhooking the handcuffs and letting him depart the premises."

Mead further alleges that at the time he was stopped by Kingston officers, he had approximately Two Thousand Dollars ($2,000) in his wallet and that after the officers returned his wallet, he discovered that the money was gone. Mead alleges that the defendant officers stole the money from his wallet. Mead claims that he later contacted the Kingston Police Department to lodge a complaint and spoke to Officer Joseph, who told him that the traffic stop was justified. Mead then requested and received an audience with James Washam, Chief of Police for the City of Kingston, Officer Joseph, and other officers.

Mead testified at his deposition that on November 12, 2005, he was selling his wood crafts at a crafts fair at the Jacobs Building at Chilhowee Park. He left the fair at approximately 5:45 p.m. He did not keep track of how much money he had made at the crafts fair; instead he simply put the money he made into a bag/wallet that he kept in his pocket. He typically counted his money at the end of each craft show, and as this particular craft show had not ended, he had not yet counted his money.

Mead stated that when the left the craft fair at 5:45 p.m. on November 12, he headed straight home without making any stops. He took the interstate to get to his home in Rockwood. He became aware that there was a police cruiser behind him with emergency equipment activated at approximately 6:45 p.m. as he was traveling in Roane County before the Kingston bridge near exit 350, but he did not immediately pull over.

Mead testified that at the time he was pulled over, he had an approximately thirteen-inch knife in the truck with him. He claims Officer Joseph opened the door of his pickup truck and pulled him out. Officer Joseph placed him in handcuffs. Mead counted nine officers at the scene, but did not know how many police cruisers were there. No other officers were involved in placing the handcuffs on him. He asked Officer Joseph at the scene who he was, and Officer Joseph identified himself. At some point during the traffic stop, one of the officers present recognized him and asked if he was Charlie Mead, to which plaintiff replied that he was.

Mead further testified that while he was handcuffed, he was asked for his wallet, but did not know which officer asked him for it. He told the officers where his wallet was located and one of the officers retrieved it from his pocket, but he did not know which officer retrieved it. He did not see anything happening with his wallet at the scene. He did not know how much money was in his wallet at the time. His wallet was placed back in his pocket while he was still handcuffed. He did not remember which officer replaced his wallet, nor did he know which officer removed the handcuffs. He testified that nothing was taken from his truck that night. He alleged that he did not notice any difference in the size of his wallet between the time that it was removed from his pocket and when it was replaced, and he did not notice that anything was missing from his wallet until the following Sunday, November 13, 2005.

Mead further testified that soon after the officer asked him if he was Charlie Mead, the handcuffs were removed. After the handcuffs were removed, one of the officers asked him if he had been drinking, and he answered that he had not. He did, however, tell the officers that he was tired. He had worked a twelve-hour day at the time of the traffic stop. He testified that there was never any physical altercation with any of the officers during the stop, and that none of the officers used any profanity during the stop. He was not issued any citation or ticket that night. Mead estimated that from the time he pulled over until he left the scene for home, only five or ten minutes elapsed.

Later that evening at home, Mead contacted Roane County dispatch to attempt to find out who had stopped him that evening. He did not tell anyone he spoke to that evening that any money was missing. When he spoke to Officer Joseph on the telephone, Officer Joseph mentioned the thirteen-inch knife Mead had in his truck with him at the time of the traffic stop. Officer Joseph also told Mead that he pulled him over because he believed Mead was driving under the influence and trying to evade pursuit, as he was "swerving all over the road." Mead denied knowing that he had been swerving to Officer Joseph.

Later that same evening, Chief Washam called Mead. Mead did not tell Chief Washam that any money was missing. Chief Washam offered to send an officer out to Mead's house to take a statement, but Mead declined the offer and said to send someone

later.  Chief Washam sent an officer a few weeks later, but Mead had already spoken to a lawyer about filing a lawsuit and he decided not to talk to the officer.

Despite his allegation that he had "approximately $2,000 stolen" from him, Mead was unable to tell at his deposition how much money he had lost: "Could have been more, could have been less."  He similarly could not say which officer was responsible for his money going missing.

Mead also met in person with Chief Washam and the City Manager of Kingston, Mr. Pinkerton.  This meeting took place the Wednesday following the traffic stop.  Officer Joseph was present, as were a "couple of others."  Mead did not recall whether he discussed any money being missing during that meeting.

Officer Joseph testified at his deposition that on November 12, 2005, he was traveling westbound on the interstate when he noticed Mead's vehicle cross the center line two or three times.  He stated he had difficulty stopping Mead.  Specifically, Officer Joseph testified that he activated his emergency lights behind Mead's vehicle and Mead moved into the slow lane.  Officer Joseph pulled in behind Mead's vehicle in the slow lane and Mead still did not pull over.  Officer Joseph then activated his spotlight in an attempt to get Mead's attention and Mead still did not pull over.  Based upon his training and experience, Officer Joseph believed Mead to be intoxicated, so much so that Mead did not realize Officer

Joseph was behind him. Officer Joseph testified that from the 911 dispatch transcript, it appeared to have taken him between three and four minutes to get Mead to pull over.

Officer Joseph further testified that after Mead finally pulled over, he got out of his patrol car and instructed Mead to put his hands out the window. Mead complied, and Officer Joseph walked to the door of Mead's vehicle and opened it. Officer Joseph believed Mead to be under the influence of alcohol or drugs and he wanted to get Mead out of physical control of his vehicle to protect the safety of the general public. Officer Joseph instructed Mead to get out of the car and then started to pull Mead out of the vehicle. At that time, Officer Joseph noticed the thirteen-inch knife by Mead's right foot near the gas pedal. Mead began to reach back inside the vehicle and Officer Joseph, having seen the knife and not knowing what Mead was reaching for, grabbed Mead and spun him around to the back of the truck.

At the back of Mead's truck, Officer Joseph and another officer placed handcuffs on Mead's wrists. Officer Joseph asked Officer Thomas Guinn to pat Mead down for weapons and to get his driver's licence while Officer Joseph checked the vehicle for other weapons as well as possible alcohol or drugs. Officer Guinn handed Officer Joseph Mead's driver's license and Officer Joseph spoke with Officer Sugarman, who was a member of the Kingston City Council and recognized Mead. Officer Joseph then spoke with Mead and determined that he did not appear to be intoxicated.

Officer Joseph testified that at no time was he in physical possession of Mead's wallet. As far as Officer Joseph knows, Officer Guinn was the only officer who had possession of Mead's wallet. Officer Joseph stated that he explained to Mead why he had pulled him over, and that Mead told him that he had been working for four days straight and was really tired, and he thanked Officer Joseph for pulling him over. Officer Joseph estimated that Mead was in handcuffs for three to five minutes.

Chief Washam testified that he personally called Mead to discuss the matter of his traffic stop and to inform Mead that if he thought he was mistreated in any way, Chief Washam "wanted to get to the bottom of it." Chief Washam later met with Mead and City Manager Pinkerton on November 16, 2005. At this meeting, Mead mentioned that he thought he was missing some money. Mead had called City Manager Pinkerton and reported that he was missing approximately One Thousand Dollars ($1,000). Chief Washam sent officers to the site of the traffic stop to investigate whether the bag might have fallen out of Mead's vehicle during the stop; however, the officers did not find anything at the scene.

Officer Thomas Guinn testified that on November 12, he was patrolling with Officer Sugarman, a part-time Kingston officer who is also a member of City Council. During their patrol, they heard over the radio that Officer Joseph had pulled in behind a vehicle and was attempting to pull it over, but that the vehicle did not appear to be stopping.

Officer Guinn communicated back to Officer Joseph that he would join Officer Joseph and attempt to help him.

Officer Guinn further testified that he arrived at the scene just past the Kingston exit on I-40 where Officer Joseph had pulled over, to find Mead on the driver's side of the bed of his truck with his left hand in handcuffs and Officer Joseph attempting to place Mead's right hand in handcuffs. Officer Guinn approached Mead and noticed that Officer Joseph was struggling to get the right handcuff onto Mead. Officer Guinn leaned down to Mead's face and asked Mead if he had been drinking, and Mead replied that he had not. Later, Officer Sugarman identified plaintiff as Charlie Mead and Officer Guinn asked Mead for his identification. Mead, still handcuffed, replied that his identification was in his left front pocket. Officer Guinn asked Mead if he could retrieve the identification from his pocket and Mead told him yes.

Officer Guinn further testified that he reached into Mead's left front pocket and removed his wallet. Officer Guinn opened the wallet in front of everyone present. Officer Guinn noticed the wallet contained "a credit card or two, and a leaf of some undetermined amount of money." Officer Guinn removed Mead's driver's license from the wallet and handed it to Officer Joseph. Officer Guinn then replaced the license in the wallet and placed the wallet back in Mead's pocket. Officer Guinn testified that he heard Officer Joseph mention that Mead had a knife in his truck with him. He further testified that Officer Joseph explained to Mead why he had pulled him over and that Mead replied to the effect

that it was probably a good thing that Officer Joseph pulled him over because he was very sleepy.

**<u>Analysis</u>**

Defendant Jason Joseph has moved for summary judgment on plaintiff's claims asserting that (1) the undisputed material facts demonstrate that he did not use excessive force during the traffic stop, (2) even assuming a constitutional violation occurred, he is entitled to qualified immunity because reasonable officers could have disagreed about the lawfulness of his actions, and (3) plaintiff's complaint fails to state a claim for which relief may be granted as plaintiff cannot identify any articulable damages, nor can he identify who may have caused his alleged damages.

Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment will be granted by the court only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show that no genuine issue of material fact exists. The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Morris to Crete Carrier Corp.,* 105 F.3d 279, 280-81 (6th Cir. 1987); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). Once the moving party presents evidence sufficient to support a motion under Rule 56, Federal Rules of Civil Procedure, the non-

moving party is not entitled to a trial simply on the basis of allegations. The non-moving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *White,* 909 F.2d at 943-44. The moving party is entitled to summary judgment if the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. *Celotex,* 477 U.S. at 323; *Collyer v. Darling,* 98 F.3d 220 (6th Cir. 1996).

It is well established that individuals have a constitutional right to be free from excessive force during an arrest. *See, e.g., Graham v. Conner,* 490 U.S. 386, 388 (1989); *Solomon v. Auburn Hills Police Dept.,* 389 F.3d 167, 173 (6th Cir. 2004). A claim of excessive force in the context of "an arrest, investigatory stop, or other seizure is analyzed under the Fourth Amendment's objective reasonableness standard." *Graham,* 490 U.S. at 388. Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interest at stake. *Id.* at 396. In considering whether a police officer acted reasonably while performing an investigatory stop, the court must pay "careful attention to the facts and circumstances of each particular case," *id.*, and "consider the difficulties of modern police work." *Smith v. Freland,* 954 F.2d 343, 346 (6th Cir. 1992).

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight . . . . The

> calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

*Id.* at 346-47 (quoting *Graham*, 490 U.S. at 396-97).

The Supreme Court has identified three factors that lower courts should consider in determining the reasonableness of force used: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officer or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Id.; Smoke v. Hall,* 460 F.3d 768, 783 (6th Cir. 2006). These factors are not an exhaustive list, as the ultimate inquiry is "whether the totality of the circumstances justified a particular sort of seizure." *St. John v. Hickey,* 411 F.3d 762, 771 (6th Cir. 2005) (quoting *Graham,* 490 U.S. at 396).

Fourth Amendment jurisprudence has long recognized that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. *Terry v. Ohio,* 392 U.S. 1, 22-27 (1968). Not every malevolent touch gives rise to a federal cause of action, nor is every push and shove, even if it may later seem unnecessary in the peace of a judge's chambers, violative of the Fourth Amendment. *Hudson v. McMillian,* 503 U.S. 1, 9 (1992).

In light of the above case law, and viewing the record in the light most favorable to Mead, the court concludes that plaintiff has not set forth facts sufficient to establish a genuine issue of material fact as to whether Officer Joseph used excessive force in the traffic stop on November 12, 2005. The undisputed material facts show that the only force used upon Mead in the traffic stop involved removing plaintiff from his vehicle and the application of handcuffs. Mead admitted that he had a thirteen-inch knife in the vehicle with him, and Officer Joseph testified that he saw the weapon and that Mead was reaching back into the vehicle as Officer Joseph pulled him out. Mead concedes that he was handcuffed for about five minutes and that the handcuffs were immediately removed when Officer Joseph learned his identity and determined that he was not intoxicated. Mead did not complain to any officer about the handcuffs or request that they be loosened or adjusted in any fashion. The application of the handcuffs in the context of the circumstances of the traffic stop was reasonable, particularly in view of Mead's admission that he did not pull over immediately, and that there was a thirteen-inch knife in the floorboard of his vehicle. Given the totality of the circumstances and plaintiff's own testimony, the court finds that Officer Joseph used no more force than necessary to effect plaintiff's seizure and that the amount of force used by Officer Joseph when handcuffing plaintiff was reasonable under the circumstances.

Even assuming a constitutional violation occurred, the court finds that Officer Joseph is entitled to qualified immunity because reasonable officers could have disagreed about the lawfulness of Officer Joseph's actions in light of the undisputed facts. The

Supreme Court has held that government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Dickerson v. McClellan,* 101 F.3d 1151, 1157 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The central purpose of affording public officials qualified immunity from suit is to protect them from undue interference with their duties and from potentially disabling threats of liability." *Id.* Courts traditionally employ a three-step test in reviewing claims for qualified immunity:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiff show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively reasonable in light of the clearly established constitutional rights.

*Sample v. Bailey,* 409 F.3d 689, 695-96 (6th Cir. 2005). Consequently, if the police officers acted in an objectively reasonable manner, as assessed in the light of clearly established law at the time of the conduct at issue, they will be insulated by qualified immunity. *Harlow,* 457 U.S. at 818. Thus, even if a police officer has deprived a plaintiff of a federal right, qualified immunity will apply if an objectively reasonable officer would not have understood, by referencing clearly established law, that his conduct was unlawful. *See County of Sacramento v. Lewis,* 523 U.S. 833, 841 n.5 (1998); *Rich v. City of Mayfield Hts.,* 955 F.2d 1092, 1095 (6th Cir. 1992). Whether an asserted federal right was clearly established at a particular time presents an issue of law. *Elder*, 510 U.S. at 516. In inquiring whether a

constitutional right is clearly established, a trial court must look first to decisions of the Supreme Court, and then to decisions of the Sixth Circuit, and other courts within the circuit, and finally to decisions of other circuits.  *Walton v. City of Southfield,* 995 F.2d 1331, 1336 (6th Cir. 1993).

The ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.  *Rich,* 955 F.2d at 1095.  Claims of qualified immunity are assessed on a fact-specific basis to ascertain whether the particular conduct of the defendant police officers infringed on the clearly established federal right of the plaintiff, and whether an objective, reasonable officer would have believed that his conduct was lawful under extant federal law.  *Anderson v. Creighton,* 483 U.S. 635, 641 (1987).

Viewing the actions of Officer Joseph from the perspective of a reasonable officer on the scene and without the benefit of 20/20 hindsight, Officer Joseph acted in a reasonable manner.  His decision to pull Mead over was justified by Mead's erratic driving.  Officer Joseph then found himself in a situation where he felt threatened by a man who had resisted pulling over immediately, and who was reaching back into his vehicle where Officer Joseph had seen a dangerous weapon in plain sight.   The amount of force used by Officer Joseph to subdue Mead until he could ascertain the risk of harm that Mead could inflict on him or others was minimal.  Police officers are often forced to make split-second judgments such as the one Officer Joseph was forced to make in this case.  The United States Supreme Court has recognized that a calculus of reasonableness must embody allowance

for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation. *Graham,* 490 U.S. at 396-97. Seeing Mead reaching back into the vehicle and seeing the thirteen-inch knife at Mead's feet, Officer Joseph was faced with circumstances that were tense, uncertain and rapidly evolving. The court finds the force he used in this case was reasonable in the light of the circumstances.

The Supreme Court has directed lower courts to evaluate the reasonableness of the officer's use of force looking at the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. At the time that Officer Joseph pulled Mead from his vehicle, Officer Joseph suspected that Mead was intoxicated and he knew that Mead was in possession of a deadly weapon. From Officer Joseph's perspective at the scene, Mead posed an immediate threat to the safety of not only the officers who confronted him, but also to himself and surrounding parties had he remained in his vehicle and fled the scene. Moreover, Mead admitted that he did not pull over immediately when he saw Officer Joseph activate his emergency equipment. Officer Joseph testified that it took between three and four minutes to get Mead to pull over. Mead's non-complaint and uncooperative actions, when assessed in light of the information available to Officer Joseph at the time, reasonably led Officer Joseph to conclude Mead might attempt to flee or evade further efforts to submit to lawful investigation. Officer

Joseph's actions were reasonable and they were taken in good faith in the performance of his duties as a police officer for the City of Kingston. Accordingly, the court finds that Officer Joseph is entitled to qualified immunity since any reasonable officer could believe his conduct was lawful given the circumstances with which Officer Joseph was faced.

As to plaintiff's allegations that he had "approximately $2,000 stolen" from him by Officer Joseph, Mead was unable to tell at this deposition how much money he had lost: "Could have been more, could have been less." He similarly could not say which officer may have been responsible for his money allegedly going missing. The only evidence in the record regarding Mead's wallet and money came from Officer Guinn, who testified that he removed Mead's wallet from his front pocket, opened the wallet, removed Mead's licence, and handed the license to Officer Joseph. Officer Joseph then returned the license to Officer Guinn, who put it back in Mead's wallet, and returned the wallet to Mead's pocket. There is no evidence in the record to establish that Officer Joseph ever had possession of the wallet or money. Mead has failed to present even a scintilla of evidence that Officer Joseph was responsible for the allegedly missing money. Accordingly, the court finds that Officer Joseph is entitled to judgment as a matter of law on all Mead's claims against him.

## **Conclusion**

For the reasons stated above, the court finds that defendant Jason Joseph is entitled to judgment as a matter of law on plaintiff's complaint. Accordingly, defendant's motion for summary judgment [Doc. 19] is hereby **GRANTED,** and this action is **DISMISSED.**

ENTER:

        s/ Thomas W. Phillips
United States District Judge